IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

HEATHER ANNE LAUGHLIN                                                                 PLAINTIFF

        v.                              Civil No. 13-3118

CAROLYN W. COLVIN, Commissioner
Social Security Administration                                                        DEFENDANT

**MEMORANDUM OPINION**

        Plaintiff, Heather Laughlin, brings this action under 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

**I.    Procedural Background:**

        Plaintiff protectively filed applications for DIB and SSI on August 9 and August 23, 2011, respectively, alleging an onset date of May 29, 2011, due to bipolar disorder, depression, and personality disorder.  Tr. 12, 141-148, 185, 202-203.  Her applications were denied initially and on reconsideration.  Tr. 12, 83-89, 94-98.  An administrative hearing was held on September 10, 2012.  Tr. 12, 41-74.  Plaintiff was present and represented by counsel.

        At the time of the hearing, Plaintiff was 30 years old and possessed the equivalent of a high school education.  Tr. 22.  She had past relevant work ("PRW") experience as a

server/waitress, hostess/receptionist, cosmetologist, sales person, and retail cashier. Tr. 21-22, 194-201.

On January 11, 2013, the ALJ found Plaintiff's mood disorder, schizoaffective disorder, and substance addiction disorder to be severe, but concluded they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. Tr. 14-16. The ALJ concluded that the Plaintiff could perform a full range of work at all exertional levels with the following nonexertional limitations: "the claimant is able to perform work where [the] interpersonal contact is incidental to the work performed, [the] complexity of [the] tasks is learned and performed by rote, with few variables, requiring little judgment, and supervision required is simple, direct, and concrete." Tr. 16. With the assistance of a vocational expert, the ALJ concluded Plaintiff could perform work as a packing machine operator, poultry production worker, production assembler, and small products assembler. Tr. 22.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on November 29, 2013. Tr. 1-6. Subsequently, Plaintiff filed this action. ECF No. 1. Both parties have filed appeal briefs, and the case is now ready for decision. ECF Nos. 10, 11.

## II. **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the

Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A Plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)-

(f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

## III.  Discussion:

Of particular concern to the undersigned is the ALJ's treatment of the medical source statement completed by Plaintiff's mental health treatment team at Health Resources of Arkansas ("HRA"). Under the social security regulations, the commissioner will generally give the opinion of a treating physician concerning the nature and severity of a claimant's impairments "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2)3; *see also Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). However, such weight is neither inherent nor automatic and does not "obviate the need to evaluate the record as whole." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

The Commissioner "'may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more  thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)); *accord Hacker*, 459 F.3d at 937 (noting we have declined "to give controlling weight to the treating physician's opinion because the treating physician's notes were inconsistent with her . . . assessment"). In so doing, the commissioner must "always

4

give good reasons . . . for the weight" given to a treating source. 20 C.F.R. § 416.927(d)(2); *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).

In the present case, Katherine Darling, Nurse Practitioner, completed a medical source statement in August 2012. Tr. 712-714. Although the Plaintiff "could be stable in a very limited and controlled environment with close monitoring," Nurse Darling concluded that she would be unable to perform "most functions related to the workplace" and to interact with the public and co-workers. Tr. 712-714. She documented marked limitations with regard to Plaintiff's ability to understand and remember very short and simple instructions, carry out detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted by them, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, travel in unfamiliar places or to use public transportation, set realistic goals, and make plans independently of others. Dr. Ron Boyle affirmed Nurse Darling's assessment and noted that the Plaintiff continued to experience auditory hallucinations in spite of taking antipsychotic medications.

The medical evidence reveals that the Plaintiff was treated for depression, bipolar disorder, and drug abuse prior to the relevant time period. She received both outpatient and

AO72A
(Rev. 8/82)

inpatient treatment for these conditions in 2005 and 2006 for which Zoloft, Lithium, and Lexapro were prescribed. Tr. 634-652, 667-678, 680-694, 701-711. Shortly thereafter, the Plaintiff's insurance lapsed and she discontinued all medications.

In October 2010, Plaintiff presented in the emergency room at St. John's Hospital. Tr. 430-435. She reported her mental health history, including a history of methamphetamine abuse in remission. Further, the Plaintiff indicated that she had recently become increasingly depressed and would not leave her home. She was ultimately released home after agreeing to establish outpatient care.

The Plaintiff then established with Nurse Darling at HRA in April 2011. Tr. 366-371, 558-561. She was initially diagnosed with major depressive disorder, reporting weekly depression, monthly anxiety, social withdrawal, feelings of hopelessness and worthlessness, and daily mood swings. Treatment notes also document recurrent problems with verbal and physical aggression toward her mother and her therapist. Tr. 372-374, 562-564.

In July 2011, the Plaintiff's sister had her transported to the emergency room ('ER") due to erratic behavior. Tr. 312-325. The Plaintiff was reportedly yelling at herself and experiencing significant personality changes. Her sister was afraid that she might have used drugs, but laboratory tests found no trace of any illegal drugs in her system. Following assessment by a psychiatrist, Plaintiff was deemed safe to return home and released.

In August 2011, Plaintiff returned to the ER with complaints of auditory and visual hallucinations. Tr. 326-345. She reported concern that she might hurt someone if she did not receive help. In fact, three days prior, the Plaintiff had threatened to stab herself with a kitchen knife. Tr. 375-379, 565-570. Dr. Francis Eaton evaluated her noting evidence of agitation,

6

anxiety, depression, and hallucinations. After entering a no harm agreement, the Plaintiff was released for follow-up with HRA.

Plaintiff returned to the ER on August 31, 2011, with a reported chemical imbalance and behavioral problems. Tr. 346-364. She was screened in the ER by HRA and transferred to the Wilbur D. Mills Crisis Unit. The Plaintiff was upset and angry, screaming, yelling, and cursing. She also threw her purse at a chair. And, although she did calm down somewhat, she remained combative throughout the majority of the screening process. The Plaintiff reported hearing voices in her head and stated that she feared for the safety of her family because someone wanted to kill her because of what had happened to her. However, she provided no explanation for this statement, and would not tell the treatment providers what had happened to her. The Plaintiff was diagnosed with psychotic disorder not otherwise specified and prescribed Haldol, Seroquel, Zyprexa, and Lamictal. Over the course of her stay, the Plaintiff's cognitive symptoms improved, as did her delusions. Tr. 384-426, 461-481, 575-598. However, her insight and judgment remained limited. On September 6, 2011, she was released from the Crisis Unit with a global assessment of functioning score ("GAF")[1] of 45, which is indicative of serious symptoms or serious impairment in social, occupational, or school functioning. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR ("DSM IV-TR") 34 (4th ed. 2000).

On September 27, 2011, David Reynolds, Plaintiff's therapist at HRA noted that she was resistant to treatment and irritable throughout the session. Tr. 600, 716. The Plaintiff also lacked focus and acted somewhat immature for her age. She reported continued auditory

---

[1]The GAF is a numerical assessment between zero and 100 that reflects a mental health examiner's judgment of the individual's social, occupational, and psychological function. *Kluesner v. Astrue*, 607F.3d 533, 535 (8th Cir. 2010).

7

hallucinations, revealing that the voices were of her exboyfriend and some of his friends threatening to kill her. The Plaintiff also endorsed visual hallucinations in the form of shadows on the wall. After reporting that she was out of some of her medications, Mr. Reynolds arranged for her to see Nurse Darling. He then assessed her with a GAF of 51, noting no improvement in her condition. A GAF of 51 indicates moderate symptoms or a moderate impairment in social, occupational, or school functioning. *See id*.

Nurse Darling's note indicates that the Plaintiff was angry, cussing and yelling at her mother and the health care provider. Tr. 600-605. She seemed to misunderstand what her mother and the provider were saying, and was angry she had to continually answer questions about her medical history and symptoms. The Plaintiff stated that her hallucinations now consisted of loud, accusing voices but acknowledged that they had improved somewhat since starting antipsychotic medications. Her mother reported continued paranoid delusions concerning her safety and the safety of her family. The Plaintiff had even called the Sheriff's Department to report that she was being stalked. Nurse Darling assessed her with a GAF of 31[2], and diagnosed mood disorder not otherwise specified and schizophreniform rule out schizophrenia. She directed the Plaintiff to wean off Zyprexa, continue taking the Haldol, and to increase her dosages of Seroquel and Lamictal.

On October 17, 2011, Nurse Darling noted that the Plaintiff's mood was both mistrustful and irritable. Tr. 606-609. The auditory hallucinations continued, rendering the Plaintiff's insight and judgment poor. Her cognitive function was documented to be only baseline. Nurse

---

[2] A GAF of 31 to 40 requires evidence of some impairment in reality testing or communication or a major impairment in several areas such as work, school, family relations, judgment, thinking, or mood. *See* DSM IV-TR 34.

8

Darling changed her diagnosis to schizoaffective disorder due to mood swings and psychosis, and assessed her with a GAF of 39. She prescribed Lamictal, Invega, Benztropine, and Zyprexa. And, the Plaintiff was advised that she would not be allowed to yell, scream, cuss, or throw items while being seen at HRA.

On November 7, 2011, Nurse Darling indicated that the Plaintiff's schizoaffective disorder had been very unstable over the previous few months. Tr. 611-614. Although somewhat improved with the addition of Invega, the hallucinations continued. Her mood swings were also leveling off and she was now sleeping well. Nurse Darling assessed the Plaintiff with a GAF of 45, indicative of continued serious symptomology, and noted only fair insight and judgment.

On December 5, 2011, the Plaintiff underwent a consultative mental evaluation with Dr. Charles Nichols. Tr. 483-489. She reported difficulty maintaining a job due to poor coping skills resulting from both her bipolar and personality disorders. And, although her mood wings had improved, her auditory hallucinations continued on a daily basis in spite of medication. However, her mood swings and irritability had improved.

Dr. Nichols found that the Plaintiff's thought processes were generally intact with cogent, linear thoughts. Her ability to interact and communicate with others was impaired due to hostility and hypersensitivity to feedback, her social mannerisms were somewhat blunt with reduced attention to social cues, her cognitive abilities and mental efficiency were average, her concentration for basic cognitive tasks was adequate, her attention span was below average, and she occasionally needed instructions and questions repeated. The Plaintiff fluctuated from cooperative to evasive during interview. And, although he noted that her symptom allegations

appeared to be congruent with her clinical presentation during the interview, Dr. Nichols concluded that she was exaggerating her symptoms.

On December 19, 2011, Nurse Darling assessed her with schizoaffective disorder and a GAF of 45 with serious symptomology. Tr. 615-616.

On February 6, 2012, Plaintiff began therapy sessions with Cynthia Crowson at HRA. Tr. 619-620, 717. Ms. Crowson noted some psychomotor activity with her right hand tapping the arm chair. The Plaintiff indicated that she was entertaining the idea of returning to work part-time once her disability was approved. Her thought processes were logical, however, they were also overly organized and descriptive. Ms. Crowson assigned her a GAF of 45, noting that she would begin Invega injections.

On February 14, 2012, Nurse Darling noted that the Plaintiff was doing well. Tr. 621-625. The Plaintiff continued to endorse auditory hallucinations and mood lability. She was very reactive to what she perceived to be criticism. Treatment notes reveal rapid and loud speech, a good mood, a reactive and broad affect, and poor insight and judgment. Nurse Darling diagnosed her with rule out borderline personality disorder with cluster B traits.

On March 6, 2012, Plaintiff continued to report threatening auditory hallucinations. Tr. 718. Ms. Crowson noted that she constantly rocked in her chair. The Plaintiff endorsed a depression of level of a 5 on a 10-point scale, reporting limited social contact outside the home. Ms. Crowson assigned her a GAF score of 50 for continued serious impairment. *Id*.

On April 3, 2012, the Plaintiff was "down." Tr. 719. She reported doing various chores around the house, including working in the family garden. Plaintiff had also been involved in some arts and crafts projects with her mother, although she did not particularly enjoy this. Ms.

Crowson assessed her with a GAF of 55, indicating moderate symptoms and/or difficulties. *Id*.

On June 8, 2012, the Plaintiff reported having a boyfriend. Tr. 720. She was very active in the discussion of problem solving techniques to deal with her boyfriends disbelief concerning her diagnoses. Plaintiff reported stress as a factor to her mood instability and expressed desire to begin working on coping/relaxation skills to deal with her stress. Her thought processes were much improved compared to her last session, and she reported swimming for exercise. However, Ms. Crowson found no improvement in her GAF score.

On August 23, 2012, Plaintiff presented for medication management with her boyfriend. Tr. 721-724. The boyfriend appeared very helpful and supportive. Although the Plaintiff's mood was good, her speech was abnormal and her attention and concentration were impaired. Nurse Darling opined that the Plaintiff was unable to function when any stressors occurred. And, she stated that the Plaintiff was unable to work "at this time." Nurse Darling assessed her with a GAF of 49, indicative of serious impairment, and indicated that her prognosis for full recovery was limited.

The ALJ, having reviewed all of the aforementioned evidence, discredited Nurse Darling's assessment stating that the treatment notes did not support her assessment of marked limitations in various areas of functioning. However, we respectfully disagree. The evidence makes clear that the Plaintiff suffers from significant mental impairments that negatively impact her ability to interact with others, accept criticism and instruction, deal with work stresses, and complete a normal workday and workweek without interruptions from psychologically based symptoms.

11

Accordingly, we find that remand is necessary to allow the ALJ to reconsider the treatment records and medical source statement provided by the Plaintiff's treatment team at HRA. Should the ALJ have questions concerning this medical source statement, he is directed to recontact Nurse Darling and/or Dr. Boyle for clarification prior to rendering an opinion on remand.

## IV.  Conclusion:

Based on the foregoing, we recommend reversing the decision of the ALJ and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 12th day of January 2016.

/s/ *Mark E. Ford*
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)